UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| MARY COLE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:15 CV 98 ACL |
| | ) | |
| SAINT FRANCIS MEDICAL CENTER, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM AND ORDER**

Plaintiff Mary Cole claims that, during her hospitalization on May 30-31, 2013, she was discriminated against on the basis of her disability and retaliated against by Defendant St. Francis Medical Center, in violation of the Missouri Human Rights Act ("MHRA"), the Americans with Disability Act ("ADA"), and Section 504 of the Rehabilitation Act of 1973.

Defendant has filed a Motion for Partial Summary Judgment as to Counts I, II, III, IV, and VI of Cole's Complaint. (Doc. 29.) Cole has filed a Response (Doc. 30), and Defendant has filed a Reply (Doc. 32).

**I.      Summary Judgment Standard**

Pursuant to Federal Rule of Civil Procedure 56(a), a district court may grant a motion for summary judgment if all of the information before the court demonstrates that "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The burden is on the moving party. *City of Mt. Pleasant, Iowa v. Associated Elec. Co-op. Inc.*, 838 F.2d 268, 273 (8th Cir. 1988). After the moving party discharges this burden, the nonmoving party must do more than show

that there is some doubt as to the facts. *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). A genuine issue of material fact is not the "mere existence of some alleged factual dispute between the parties." *State Auto. Ins. Co. v. Lawrence,* 358 F.3d 982, 985 (8th Cir. 2004). "Instead, the dispute must be outcome determinative under prevailing law." *Mosley v. City of Northwoods,* 415 F.3d 908, 910-11 (8th Cir. 2005) (internal quotations omitted). A fact is material when it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

The nonmoving party bears the burden of setting forth specific facts showing that there is sufficient evidence in his favor to allow a jury to return a verdict for him. *Anderson*, 477 U.S. at 249; *Celotex*, 477 U.S. at 324. "If 'opposing parties tell two different stories,' the court must review the record, determine which facts are material and genuinely disputed, and then view those facts in a light most favorable to the nonmoving party – as long as those facts are not 'so blatantly contradicted by the record . . . that no reasonable jury could believe' them." *Reed v. City of St. Charles, Mo*., 561 F.3d 788 (8th Cir. 2009) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). Self-serving, conclusory statements without support are not sufficient to defeat summary judgment. *Armour and Co., Inc. v. Inver Grove Heights,* 2 F.3d 276, 279 (8th Cir. 1993).

In ruling on a motion for summary judgment, the court must review the facts in a light most favorable to the nonmoving party and give that party the benefit of any inferences that logically can be drawn from those facts. *Matsushita,* 475 U.S. at 587; *Woods v. DaimlerChrysler Corp.,* 409 F.3d 984, 990 (8th Cir. 2005). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (quoting *Reeves*

*v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)). The court is required, however, to resolve all conflicts of evidence in favor of the nonmoving party. *Robert Johnson Grain Co. v. Chemical Interchange Co.*, 541 F.2d 207, 210 (8th Cir. 1976).

## II.     Factual Background[1]

Plaintiff Mary Cole was admitted to Saint Francis Medical Center ("SFMC") on May 30, 2013, via ambulance. Cole believed she was having a heart attack.

SFMC is a Missouri not-for-profit corporation located in Cape Girardeau, Missouri. SFMC's Bylaws state, in relevant part:

> The Medical Center, sponsored by Saint Francis Healthcare System, a Private Non-Collegial Juridic Person under the jurisdiction of the Bishop of the Roman Catholic Diocese of Springfield-Cape Girardeau, participates in the health care mission of the Roman Catholic Church. As such, the Medical Center and all who are associated with it are responsible to function in a manner which is consistent with and in furtherance of the health care apostolate of the Roman Catholic Church.

(Doc. 28-2 at 1.) SFMC's Articles of Incorporation provide that it is to be "operated as a Catholic Hospital and shall be a member of the Catholic Hospital Association." (Doc. 28-3 at 2.) The Articles of Incorporation further provide that all proposed members of the Board of Directors must be submitted to and approved by the acting Bishop or Administrator of the Diocese of Springfield/Cape Girardeau or its successor diocese. The Articles of Incorporation provide that they may be amended, but only upon the approval of the acting Bishop or Administrator of the Diocese of Springfield/Cape Girardeau.

---

[1]The undisputed facts are taken from facts that (1) Cole admitted were undisputed in her Response or (2) Cole alleged were disputed but failed to properly and/or directly controvert. The movant's statement of facts are deemed admitted if not specifically controverted by the party opposing the motion with specific references to portions of the record as required by Local Rule 4.01(E) and Federal Rule of Civil Procedure 56(c)(1).

3

In its public Internal Revenue Service ("IRS") filings, SFMC describes its "mission" as follows:

> The mission of Saint Francis Medical Center is to provide a ministry of healing and wellness inspired by its Christian philosophy and values…Saint Francis Medical Center is a 277-bed facility serving more than 650,000 people throughout Missouri, Illinois, Kentucky, Tennessee, and Arkansas. The medical center provides comprehensive inpatient acute care services for medical and surgical patients specializing in orthopedics, neurosurgery, cardiovascular services, oncology, disease management, gastroenterology, maternal-child health and neurology.

(Doc. 31-1 at 1.) In its IRS filings, SFMC gives as its reason for obtaining tax-exempt status that it is "a hospital or a cooperative hospital service organization," as opposed to a "church, convention of churches, or association of churches…" *Id.* at 13.

Cole is deaf. Cole's first and preferred language is American Sign Language ("ASL"). When Cole was admitted to SFMC on May 30, 2013, an interpreter who is fluent in ASL was present and assisted Cole and SFMC staff in communicating effectively.

On the morning of May 31, 2013, the same live ASL interpreter was present when Cole was scheduled to undergo medical testing. Fran Sauer, Manager of Inpatient Rehabilitation Services at SFMC, asked Cole whether she would be willing to use the hospital's new Video Remote Interpreting ("VRI") service. Cole agreed to use VRI.

The VRI system had not been used by a deaf patient prior to its use by Cole. Ms. Sauer thought this was the perfect opportunity to trial the system because there was a live ASL interpreter present to work in tandem with the VRI system. SFMC had implemented the VRI system after the company it uses for live interpreters, Southeast Alliance for Disability Independence ("SADI"), sent interpreters to the hospital on more than one occasion who did not have the right level of certification to provide medical interpretive services. Cole works for SADI as a Communication Specialist, but is not an interpreter.

The VRI system was used in Cole's room for thirty to forty-five minutes. The parties dispute whether the VRI operated effectively. At some point, Cole refused the VRI system because she believed it was ineffective. Cole alleges that SFMC then instructed the live interpreter to leave. Defendant disputes that SFMC ever asked the live interpreter to leave. SFMC used other methods of communication, including a white board, after Cole refused the VRI system and the live interpreter left. The parties dispute whether Cole had effective communication available to her throughout the day on May 31, 2013, including when she underwent the surgical implantation of a loop recorder device for her heart.

### III. Discussion

### A. Religious Exemption (Counts I, II, III, IV)

Defendant first argues that SFMC is entitled to judgment as a matter of law on Counts I, II, III and IV based on the religious exemptions found in the MHRA and Title III of the ADA.

#### 1. MHRA

Counts I and II of Cole's Complaint allege that Defendant discriminated against her based upon her disability under the MHRA by failing to provide her with her preferred, requested, and reasonable accommodation of access to an ASL interpreter, and then retaliated against her by requiring her ASL interpreter to leave and failing to provide any further accommodations.

Defendant argues that, because SFMC is operated on behalf of the Roman Catholic Church, it is exempt from the public accommodations provisions of the MHRA, and Cole's claims must fail. Defendant relies on the Bylaws and Articles of Incorporation of SFMC.

5

Cole argues that, because the Roman Catholic Church is a legal entity separate from SFMC, SFMC should not be exempt from the ADA[2] unless the Church "actually controls SFMC as a matter of undisputed fact." (Doc. 30 at 5.) Cole contends that SFMC has failed to provide facts demonstrating such control. She argues that neither the Articles of Incorporation nor Bylaws of SFMC provide any evidence about how SFMC actually operates. Cole further argues that SFMC's IRS filings show that SFMC's activities are "secular, not religious, and do not appear to be controlled in any meaningful way by the Church." *Id.*

The MHRA provides, in relevant part, as follows:

1. All persons within the jurisdiction of the state of Missouri are free and equal and shall be entitled to the full and equal use and enjoyment within this state of any place of public accommodation, as hereinafter defined, without discrimination or segregation on the grounds of race, color, religion, national origin, sex, ancestry, or disability.

2. It is an unlawful discriminatory practice for any person, directly or indirectly, to refuse, withhold from or deny any other person, or to attempt to refuse, withhold from or deny any other person, any of the accommodations, advantages, facilities, services, or privileges made available in any place of public accommodation, as defined in section 213.010 and this section, or to segregate or discriminate against any such person in the use thereof on the grounds of race, color, religion, national origin, sex, ancestry, or disability.

3. *The provisions of this section shall not apply to a private club, a place of accommodation owned by or operated on behalf of a religious corporation, association or society*, or other establishment which is not in fact open to the public, unless the facilities of such establishments are made available to the customers or patrons of a place of public accommodation as defined in section 213.010 and this section.

Mo. Rev. Stat. Ann. § 213.065 (emphasis added).

Defendant has presented evidence sufficient to show that SFMC falls within the religious exemption of the MHRA. SFMC's Bylaws provide that it is "under the jurisdiction of the

---

[2] Cole discusses Defendant's exemption under the MHRA and ADA together, noting that interpretation of the ADA's exemption is instructive on the MHRA's exemption. (Doc. 30 at 3.)

6

Bishop of the Roman Catholic Diocese of Springfield-Cape Girardeau," "participates in the health care mission of the Roman Catholic Church," and functions "in a manner which is consistent with and in furtherance of the health care apostolate of the Roman Catholic Church." (Doc. 28-2 at 1.) SFMC's Articles of Incorporation state that SFMC is to be "operated as a Catholic Hospital and shall be a member of the Catholic Hospital Association." (Doc. 28-3 at 2.) The Articles of Incorporation further provide that all proposed members of the Board of Directors must be submitted to and approved by the acting Bishop or Administrator of the Diocese of Springfield/Cape Girardeau, and that the Articles of Incorporation may be amended only upon the approval of the acting Bishop or Administrator of the Diocese of Springfield/Cape Girardeau.

Cole, noting that no court has addressed the religious exemption of the MHRA, argues that Defendant should be required to present more evidence to support its claim that the Roman Catholic Church actually controls SFMC. Although Defendant has brought forth minimal evidence in support of its Motion for Summary Judgment, this evidence shows that SFMC meets the clear language of the MHRA religious exemption. Cole has presented no evidence to controvert Defendant's facts. As Defendant points out, the issue of SFMC's religious exemption under the MHRA and ADA was properly raised by Defendant as an affirmative defense. As such, Cole had sufficient notice of this argument, and had ample opportunity to conduct discovery on the issue.

The only evidence Cole produces in opposition to Defendant's Motion for Summary Judgment on the issue of exemption is the IRS filings of SFMC. These filings cite the mission of SFMC as providing "a ministry of healing and wellness inspired by its Christian philosophy and values…" (Doc. 31-1 at 1.) The IRS filings also indicate its reason for obtaining tax-exempt

status—that being, it is "a hospital or a cooperative hospital service organization," as opposed to a "church, convention of churches, or association of churches…" This evidence is not inconsistent with a finding that SFMC is operated on behalf of the Roman Catholic Church. The fact that SFMC is itself not a church is immaterial, as the MHRA religious exemption is not limited to churches. The mission stated in the IRS filings are consistent with an entity operated on behalf of a religious organization.

Based on the Bylaws and Articles of Incorporation of SFMC, SFMC falls within the clear language of MHRA's exemption for places of accommodation "operated on behalf of" religious groups. Cole presents no evidence to controvert Defendant's facts. Cole's mere speculation that the Roman Catholic Church does not actually control SFMC is not sufficient to overcome the evidence Defendant has presented. Thus, SFMC is exempt from the MHRA and Defendant's Motion for Summary Judgment will be granted as to Counts I and II of Cole's Complaint.

### 2. ADA

In Counts III and IV of Plaintiff's Complaint, she alleges that Defendant violated the ADA by failing to provide her with the lawfully required auxiliary aids and services to which she was entitled, and by retaliating against her after she requested an accommodation.

Defendant argues that its Bylaws and Articles of Incorporation establish that it is an entity controlled by a religious organization and, therefore, is exempt from liability under Title III of the ADA. Cole contends that Defendant has not submitted evidence sufficient to find that the Roman Catholic Church controls SFMC.

Title III of the ADA prohibits any persons who owns, leases, or operates a place of public accommodation from discriminating against an individual on the basis of that individual's disability. *See* 42 U.S.C. § 12182(a). Title III by its terms does not apply to "religious

organizations or entities controlled by religious organizations, including places of worship." 42 U.S.C. § 12187; *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 689 n. 51 (2001) (noting that Congress "expressly exempted" religious organizations or entities from Titles III's coverage); *Woods v. Wills*, 400 F. Supp. 2d 1145, 1161 (E.D. Mo. 2015).

> The relevant regulations provide as follows:
>
> The ADA's exemption of religious organizations and religious entities controlled by religious organizations is very broad, encompassing a wide variety of situations. Religious organizations and entities controlled by religious organizations have no obligations under the ADA. Even when a religious organization carries out activities that would otherwise make it a public accommodation, the religious organization is exempt from ADA coverage. Thus, if a church itself operates a day care center, a nursing home, a private school, or a diocesan school system, the operations of the center, home, school, or schools would not be subject to the requirements of the ADA or this part. The religious entity would not lose its exemption merely because the services provided were open to the general public. The test is whether the church or other religious organization operates the public accommodation, not which individuals receive the public accommodation's services.
>
> Religious entities that are controlled by religious organizations are also exempt from the ADA's requirements. Many religious organizations in the United States use lay boards and other secular or corporate mechanisms to operate schools and an array of social services. The use of a lay board or other mechanism does not itself remove the ADA's religious exemption. Thus, a parochial school, having religious doctrine in its curriculum and sponsored by a religious order, could be exempt either as a religious organization or as an entity controlled by a religious organization, even if it has a lay board. The test remains a factual one—whether the church or other religious organization controls the operations of the school or of the service or whether the school or service is itself a religious organization.

28 C.F.R. Pt. 36, App. C.

No appellate court has considered Title III's religious exemption. District courts from other jurisdictions considering this issue have found various religious-affiliated entities exempt from Title III of the ADA. In *Rose v. Cahee*, 727 F. Supp.2d 728, 747 (E.D. Wis. 2010), a not-for-profit, tax exempt healthcare corporation was found to be controlled by a religious organization where a Roman Catholic institute sponsored the corporation and occupied a primary

9

role in the corporation's corporate governance structure, the institute members made up one class of corporate membership, and the institute's class members alone had authority to amend or repeal the corporation's articles of incorporation and bylaws. *See also Marshall v. Sisters of Holy Family of Nazareth*, 399 F. Supp.2d 597, 598 (E.D. Pa. 2005) (grade school operated by Roman Catholic nuns exempt when curriculum included bible study and Christian principles, and school listed in "The Official Catholic Directory"); *White v. Denver Seminary*, 157 F. Supp.2d 1171, 1173 (D. Colo. 2001) (seminary exempt when its purpose was to train students for Christian ministry, faculty and students required to assert a statement of religious beliefs and participate in religious curriculum, and majority of Board of Trustees had to be members of the Conservative Baptist Association). *But see Sloan v. Community Christian Day School, LLC,* No. 3-15-0551, 2015 WL 10437824, at * 3, (M.D. Tenn. Dec. 11, 2015) (Christian school not exempt when school not owned, affiliated with, or financially supported by any recognized religious group; owned by two individuals who were not ministers).

SFMC's Bylaws and Articles of Incorporation support Defendant's argument that it is controlled by the Roman Catholic Church. Specifically, SFMC is under the jurisdiction of the Bishop of the Roman Catholic Dioceses of Springfield-Cape Girardeau, participates in the health care mission of the Roman Catholic Church, SFMC and its associates must function in a manner consistent with the doctrine of the Roman Catholic Church, all proposed members of the Board of Directors must be submitted to and approved by the acting Bishop or Administrator of the Diocese of Springfield/Cape Girardeau, and the Articles of Incorporation can only be amended upon the approval of the acting Bishop or Administrator of the Diocese of Springfield/Cape Girardeau. As previously discussed, Cole has offered no evidence to refute this finding. Given that the regulations provide that Title III's religious exemption is "broad," and in the absence of

controverting evidence, the Court finds that SFMC is exempt from Title III of the ADA and Defendant's Motion for Summary Judgment will be granted as to Counts III and IV of Cole's Complaint.

**B.      Rehabilitation Act Retaliation Claim (Count VI)**

Defendant next argues that SFMC is entitled to judgment as a matter of law on Counts II, IV, and VI based on the absence of any facts to support Cole's retaliation claims. Defendant also contends that SFMC is further entitled to partial summary judgment on Counts I and II based on the absence of any evidence to support Cole's claims for punitive damages under the MHRA, and Count III based on the prohibition in Title III of the ADA for compensatory damages and the inappropriateness of a mandatory injunction against the hospital. Because the Court has granted Defendant's Motion for Summary Judgment as to Counts I, II, III, and IV, the only issue remaining is whether SFMC is entitled to judgment on Cole's retaliation claim under the Rehabilitation Act alleged in Count VI.

In Count VI, Cole alleges that SFMC retaliated against her in violation of Section 504 of the Rehabilitation Act of 1973 by denying her any reasonable accommodation after she opposed SFMC's unlawful actions. Defendant argues that Cole cannot establish the elements of her retaliation claim because she seeks to use identical facts to establish both discrimination and retaliation. Cole contends that she has adduced sufficient evidence to support her retaliation claim.

The Rehabilitation Act requires that institutions that receive federal funding provide an "otherwise qualified handicapped individual" with "meaningful access to the benefit that the grantee offers." *Alexander v. Choate,* 469 U.S. 287, 301 (1985). In determining whether hearing impaired individuals have been discriminated against by reason of such disability, the legal

standard is whether the individual "receive[d] effective communication that result[ed] in meaningful access to a public entity's services." *Bahl v. County of Ramsey*, 695 F.3d 778, 784 (8th Cir. 2012).

The Eighth Circuit has recognized a cause of action for retaliation under the Rehabilitation Act, and retaliation claims under the Act and the ADA are treated interchangeably. *Hill v. Walker*, 737 F.3d 1209, 1218 (8th Cir. 2013). To establish unlawful retaliation, a plaintiff must demonstrate: (1) that she engaged in a statutorily protected activity, (2) that an adverse action was taken against her, and (3) a causal connection between the adverse action and the protected activity. *Mershon v. St. Louis University*, 442 F.3d 1069, 1074 (8th Cir. 2006).

Cole argues that the following facts meet the elements of a retaliation claim: (1) she complained about SFMC's use of nonfunctional VRI, which is made unlawful by the ADA; (2) SFMC's response to Cole's complaint was to tell the onsite interpreter to leave the premises and to force the nonfunctional VRI upon Cole for the remainder of her hospital stay, including during her surgery when she was conscious and in pain; and (3) Cole's testimony establishes that SFMC's adverse action was causally related to her complaint, as SFMC forced the onsite interpreter to leave and forced Cole to use the nonfunctional VRI *because* Cole expressed her displeasure with the nonfunctional VRI. (Doc. 30 at 7.) Defendant maintains in its Reply that the alleged discrimination and alleged retaliation are the same alleged event, and further argues that there is no evidence Cole complained of discrimination.

The undersigned finds that Cole has set forth sufficient evidence to establish a retaliation claim under the Rehabilitation Act. It is undisputed that Cole initially consented to the use of the VRI system, but subsequently complained that the system was not functioning properly, and

refused to use the system. (Defendant's Response to Plaintiff's Statement of Fact ¶ 17, Doc. 33 at 7.) Cole's deposition testimony is replete with allegations that she complained to SFMC of the perceived inadequacies of the VRI system. For example, Cole testified as follows:

> In regards to the VRI, they had struggled to make a connection on the VRI device, took about roughly ten minutes, the screen was extremely small, the picture of the interpreter on the device that they were using was very, very small and I had asked the interpreter what her level of interpreting is, and the interpreter on the VRI, and she refused to provide me any information. But it is my right to know the level of interpreter that I have to make sure they're an appropriate fit for the situation and the appropriate level for the situation. And that interpreter hung up on us. So she tried to re-connect and they were having some connectivity issues. Very pixilated. Colors were everywhere. I was missing what the interpreter was saying because it was not a smooth picture. It was choppy and jumpy. So I did let Fran know that it is not clear due to the pixilation and the choppiness of the picture. It was not appropriate for the environment. And I was unable to see that interpreter because the interpreter on screen was very, very small. The interpreter did interpret—the live interpreter that was there did interpret all of the interaction of what Fran was saying and my interaction with Fran about the VRI and how it was not being successful or not effective. She continued to work on the VRI. Told Maria to step back, not to interpret it. So the live interpreter was basically in the background while Fran struggled to get the VRI to work. She was rather stubborn with it, I must say. Very determined. But I just knew that I wasn't going to work. So they moved the VRI in the hall and then it worked, brought it back into the room and again the connectivity issues, it disconnected. I had asked Fran to please let's go ahead and use the live interpreter that's in the room, but she chose to ignore that request and continued to use the VRI service. A nurse or doctor, they were waiting for my procedure to take place, but she was rather determined and had a bit of an attitude and was rude. And just very disrespectful to the live interpreter and it was a waste of our time even trying to get the VRI to work that did not work.

(Doc. 28-1 at 57-59.)

Although Defendant disputes that the VRI system was not effective, Defendant does not dispute the fact that Cole made these complaints. Ms. Sauer was aware of Cole's complaints about the VRI system, as she testified that "it was obvious to me that [Cole] did not like the [VRI] system." (Doc. 28-5 at 32.) As Cole points out, the use of nonfunctional VRI is an act or practice made unlawful by the ADA. *See* 28 C.F.R. § 36.303(f) (setting forth specific

13

requirements to ensure effective communication when VRI is used). Cole has, therefore, set forth sufficient facts to establish the first element of her retaliation claim.

Cole's testimony that Ms. Sauer directed the live interpreter to leave and forced Cole to use the non-functional VRI system during her surgery after she refused the VRI supports her claim that an adverse action was taken against her. (Doc. 28-1 at 59-60, 63-64, 66-67, 68, 122.) Cole does not allege that the VRI system was ineffective to support a claim of discrimination alone. Rather, she alleges SFMC took the distinct additional action of directing the live interpreter to leave after Cole complained that the VRI system did not provide effective communication. As such, Cole is not merely reframing her discrimination claim as Defendant claims. Further, the fact that Ms. Sauer allegedly directed the interpreter to leave immediately following Cole's complaint about the effectiveness of the VRI system and refusal to use the system supports her claim that the action was taken because of her protected activity.

Ms. Sauer denies directing the interpreter to leave, but she was aware that Cole eventually refused to use the VRI system due to its alleged ineffectiveness, and that the live interpreter was not present during Cole's surgery. (Doc. 28-5 at 32.) Ms. Sauer further testified that she "left the situation" after being informed that Cole had refused the VRI system, and did not follow up regarding whether the VRI system was effective or attempt to secure an in-person interpreter. *Id.* Viewing the evidence in a light most favorable to Cole, a reasonable juror could find that SFMC engaged in improper retaliation. Thus, Defendant's Motion for Summary Judgment will be denied as to Count VI.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant's Motion for Partial Summary Judgment (Doc. 29) is **granted in part** and **denied in part**.

**IT IS FURTHER ORDERED** that Defendant is granted summary judgment as to Counts I, II, III, and IV, and Defendant is denied summary judgment as to Count VI.

/s/ Abbie Crites-Leoni
ABBIE CRITES-LEONI
UNITED STATES MAGISTRATE JUDGE

Dated this 29th day of December, 2016.